# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

STEVEN L. JOHNSON,       )
                         )
     Plaintiff,         )
                         )
     vs.              )     **Case number 4:11cv1554 RWS**
                         )                  **TCM**
MICHAEL J. ASTRUE,      )
Commissioner of Social Security,  )
                         )
     Defendant.       )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the application of Steven L. Johnson for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433.  Mr. Johnson has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.  The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Steven Johnson (Plaintiff) applied for DIB in January 2010, alleging he was disabled as of May 30, 2009, by post-traumatic stress disorder (PTSD), depression, anxiety and panic attacks, difficulties concentrating and remembering, nightmares, sleep disruption, fatigue,

back pain, and a right leg injury. (R.[1] at 166-69.) His application was denied initially and after a hearing held in October 2010 and a supplemental hearing held in March 2011, both before Administrative Law Judge (ALJ) Randolph E. Schum. (Id. at 9-20, 24-66, 73-74, 77-81.) The Appeals Council then denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and John McGowan, Ed.D., testified at the first hearing.

Plaintiff testified that, at the time of the hearing, he was 41 years old. (Id. at 26.) He completed high school and a one and one-half year program in aviation maintenance. (Id. at 26-27.) He has worked in aviation maintenance for Global Flight Academy, T.W.A., and Ozark Airlines. (Id. at 27.) He was a lead worker, or foreman, for Impact Aviation for five years. (Id. at 27-28.) His employment in the aircraft industry ended after 9/11 when he did not have enough seniority to remain at the St. Louis location and was laid-off. (Id. at 30.) He was also self-employed as a dump truck operator from 1993 to 1998. (Id. at 28.) And, in 2004, he worked for approximately six months as a parts counter salesperson. (Id. at 29-30.)

After he was laid-off, Plaintiff was injured in a motorcycle accident. (Id. at 31.) He sustained injuries to his right leg and hand and left hip. (Id.) And, he developed PTSD. (Id.)

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

His wife was also in the accident, sustained a brain injury, and has not been able to function since.  (Id.)

Plaintiff had surgery on his neck in approximately 1998 or 1999.  (Id. at 34.)

Plaintiff testified that he has problems sleeping because of nightmares and sleep apnea. (Id.)  He uses a continuous positive airway pressure (CPAP) machine that helps, but does not resolve the problem.  (Id. at 34-35.)  He sleeps continuously one and one-half to two and one-half hours at the most.  (Id. at 35.)

After the accident, Plaintiff no longer rides his motorcycle.  (Id.)  He no longer plays with his children, a son who is nineteen years old, a daughter who is seventeen, and another son who is four years.  (Id.)  He becomes emotional when he is with his children and cannot focus on them.  (Id. at 35-36.)  Also, Plaintiff forgets things, is always anxious, has problems focusing, and has periods when he is depressed.  (Id. at 36-38.)  He is no longer able to complete a project in a reasonable amount of time.  (Id. at 37.)  He does not like being in a crowd and does not socialize like he used to do.  (Id. at 38.)

Dr. McGowan testified as a vocational expert (VE).  Asked if a hypothetical claimant limited to the full range of light work[2] could perform any of Plaintiff's past relevant work, the VE replied that the claimant could perform Plaintiff's past work as a parts salesman in a motorcycle shop.  (Id. at 39.)  If this hypothetical claimant was also limited to simple, repetitive work, Plaintiff's past relevant work would be unavailable.  (Id. at 39-40.)  There

---

[2]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

were, however, other jobs such claimant could perform. (Id. at 40.) These jobs included simple routine bench assembly type jobs and electric sealing machine operator jobs. (Id.) These jobs existed in significant numbers in the state and national economies. (Id.) If the assessment of Plaintiff's physician, Dr. Liss, that Plaintiff could not meet competitive standards was accepted, there would be no appropriate jobs. (Id. at 41-42.)

Plaintiff was present but did not testify at the supplemental hearing. (Id. at 47.) James Reid, Ph.D., a clinical psychologist, and Jeffrey Magrowski, Ph.D., a VE, did testify.

Dr. Reid testified that he had reviewed the assessments of Drs. Long and Liss and, in his opinion, a diagnosis of anxiety reaction secondary to injury was appropriate. (Id. at 47.) He criticized Dr. Liss' records listing PTSD as a diagnosis and a Global Assessment of Functioning (GAF) of 40[3] without a description of any corroborating symptoms. (Id. at 48.) Dr. Reid did not agree with a diagnosis of PTSD "being so quickly made" after the accident and noted that since then there were no symptoms reflecting the chronic nature of PTSD. (Id. at 48-49.) Dr. Reid also opined that the conclusions in Dr. Liss' medical source statement were not supported by his notes. (Id. at 49-50, 52-53, 57-58.) Dr. Reid did not find any evidence that Plaintiff had a mental impairment of listing-level severity. (Id. at 50.) He testified that a mental RFC described by Dr. Liss would suggest that the patient be referred

_____

[3]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." DSM-IV-TR at 34 (emphasis omitted).

for psychological treatment for PTSD, including cognitive behavior or psychotherapy, but Dr. Liss only prescribed medication. (Id. at 51.) Noting that Plaintiff was described as having a GAF of 60[4] in November 2009, Dr. Reid further testified that an acute stress reaction may last approximately six months. (Id. at 52.)

Asked about the one-time evaluation by Dr. Long, Dr. Reid testified that, with the restrictions defined by Dr. Long, Plaintiff would be able to perform simple, repetitive work away from the public. (Id. at 53-55.) Dr. Reid noted that Dr. Long had interviewed Plaintiff but had not tested him. (Id. at 55-56.) The length of the interview was not in the record. (Id. at 56, 57.) Dr. Liss had also not tested Plaintiff. (Id. at 61.) In answer to a question by Plaintiff's attorney, Dr. Reid noted that Dr. Liss was a psychiatrist and psychiatrists did not perform psychological testing similar to that performed by psychologists. (Id. at 61-62.) In answer to a question by the ALJ, Dr. Reid further noted that psychiatrists do sometimes refer patients for psychological testing. (Id. at 62.)

The VE was asked to assume a person of Plaintiff's age and education who was capable of light work; able to understand, remember, and carry out at least simple instructions and non-detailed tasks; could respond appropriately to supervisors and co-workers; could perform tasks in a setting where contact with others was infrequent; should not work in a setting with constant or regular contact with the general public; and should not perform work including more than infrequent handling of customer complaints. (Id. at 63.) The VE

_____

[4]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

testified that such a hypothetical claimant could not perform Plaintiff's past relevant work. (Id.)

There was, however, other work this claimant could perform, e.g., light stocking type work, light work bagging garments, and light assembly work. (Id. at 63-64.) The VE listed the *Dictionary of Occupational Titles* (DOT) number for such jobs and the approximate number of jobs in the state and national economies. (Id.) His testimony was consistent with the DOT and with the *Selected Characteristics of Occupations*. (Id. at 64.)

If the hypothetical claimant could not do simple tasks, he could not do the described jobs. (Id. at 65.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, records from health care providers, and assessments by examining and non-examining consultants.

When applying for DIB, Plaintiff completed a Disability Report. (Id. at 191-99.) He listed his height as 6 feet tall and his weight as 230 pounds. (Id. at 191.) He is limited in his ability to work by PTSD, depression, anxiety and panic attacks, difficulties concentrating and remembering, nightmares, sleep disruption, fatigue, back pain, and a right leg injury. (Id. at 192.) These impairments first bothered him on May 30, 2009, and caused him to be unable to work that same day. (Id.) He stopped working, however, on April 30, 2009, when he was laid-off. (Id.) Because of his impairments, he has been unable to return to work. (Id.)

Asked on a Function Report to describe what he does after he wakes up each day, Plaintiff replied that he uses the bathroom, drinks coffee, watches television, takes a shower, and eats. (Id. at 225.) He does not take care of anyone else. (Id. at 226.) His wife helps take care of their children. (Id.) Before his injuries, he worked on aircraft, socialized, cooked, did home projects, and used the Internet with his children. (Id.) Now, he cannot sleep at night because of the nightmares and cannot stay awake during the day. (Id.) He is shaved by his wife. (Id.) He does not cook because his wife is afraid he will burn the house down. (Id. at 227.) He does not do any household chores. (Id.) He goes outside once a week. (Id. at 228.) He drives a car and can go out alone. (Id.) He spends time with other people when they visit him at home. (Id. at 229.) This does not happen often because of his anxiety. (Id.) He has difficulty handling advice from others who do not know what he is going through. (Id. at 230.) His impairments affect his abilities to talk, see, remember, complete tasks, concentrate, understand, and get along with others. (Id.) He can walk for thirty minutes before having to rest for ten. (Id.) He can pay attention for one minute. (Id.) He does not finish what he starts. (Id.) He does not handle stress well; his wife handles changes in routine. (Id. at 231.)      Plaintiff's wife completed a Function Report on his behalf.[5] (Id. at 215-22.) She described his daily activities as watching television and resting. (Id. at 215.) She reported that his impairments affect his sleep, but did not explain how. (Id. at 216.) He has no problem with his personal grooming. (Id.) He needs to be reminded to take his medicine. (Id. at 217.) He does not do any household chores and does not cook for fear

---

[5]This report was completed in February 2010, the year after Plaintiff completed his.

he will forget and burn the house down.  (Id.)  He is able to pay bills and handle savings and checking accounts.  (Id. at 218.)  His impairments affect his abilities to understand, talk, complete tasks, get along with others, remember, and concentrate.  (Id. at 220.)  He has a short attention span.  (Id.)  He does not follow written instructions well, but does follow spoken ones.  (Id.)  He does not handle stress well.  (Id.)

The medical records before the ALJ are summarized below in chronological order and begin on April 8, 2009, when Plaintiff consulted Xiaohui Fan, M.D., with Advanced Pain Center about his chronic thoracic pain of five years.  (Id. at 346-48.)  He described the pain as a ten on a ten-point scale.  (Id. at 346.)  The pain only interfered with some daily activities, but did interfere with sleep.  (Id.)  Muscle relaxers did not help; hydrocodone[6] did.  (Id.)  It was noted that a magnetic resonance imaging (MRI) of the spine had shown only mild spondylosis.  (Id.)  He was prescribed Diazepam[7] and hydrocodone-acetaminophen.  (Id. at 347.)  He was to return in two weeks.  (Id.)  He returned in one.  (Id. at 341-45.)  His prescription for hydrocodone-acetaminophen, which had been for a fifteen-day supply, was renewed for a thirty-day supply.  (Id. at 344.)

Also on April 14, Plaintiff consulted Mark Rickmeyer, D.O., complaining of constantly being exhausted.  (Id. at 283-86.)  Dr. Rickmeyer noted that Plaintiff had gained

---

[6]Hydrocodone is an opioid analgesic prescribed for the relief of moderate to moderately severe pain.  Physicians' Desk Reference, 573 (65th ed. 2011) (PDR).

[7]Diazepam is prescribed for the treatment of anxiety disorders.  See Drugs.com, Diazepam, http://www.medilexicon.com/drugsearch.php?s=diazepam (last visited July 18, 2012).

a lot of weight since he had last seen him[8] and concluded that the CPAP machine needed to be retitrated accordingly. (Id.) Plaintiff also requested, and was given, a refill of his prescription for Celexa for his depression. (Id. at 283.) Provigil[9] was added to his medications. (Id. at 284.) Dr. Rickmeyer's impression was of excessive daytime sleepiness, sleep apnea, major depressive disorder – moderate, fatigue, and excessive weight gain. (Id. at 283-84.)

Plaintiff next saw Dr. Fan on May 6 and was given a spinal nerve block injection. (Id. at 338-40.) Six days later, Plaintiff described the thoracic pain as a seven. (Id. at 334-36.) The injection had helped for only two days. (Id. at 335.) He was given a prescription for Dilaudid.[10] (Id.) One week later, on May 19, Plaintiff reported that the Dilaudid was not helping and wanted a change in medication. (Id. at 330-32.) The pain was usually an eight. (Id. at 330.) Plaintiff was described as being alert, awake, and oriented to time, place, people, and location. (Id. at 331.) His speech, thought process, associations, and judgment were normal. (Id.) He had no psychotic thoughts.[11] (Id.) The Dilaudid was changed to hydrocodone-acetaminophen. (Id.)

---

[8]No earlier records of Dr. Rickmeyer were before the ALJ.

[9]Provigil is prescribed to improve wakefulness. PDR at 974.

[10]Dilaudid, hydromorphone hydrochloride, is prescribed for pain management. PDR at 2873, 2874.

[11]The substance of this psychiatric evaluation of Plaintiff by Drs. Fan and Naushad are, unless otherwise noted, repeated throughout their records.

Plaintiff was taken by ambulance on May 30 to St. John's Mercy Medical Center (St. John's) after being in a motorcycle accident.  (Id. at 253-65.)  He was alert and oriented to time, place, and person.  (Id. at 254.)  He had abrasions to his left arm, axilla, flank, and thigh and to his right arm and shin.  (Id.)  His ankle was tender to the touch.  (Id.)  He denied any loss of consciousness.  (Id.)  His pain was a five on a ten-point scale and was alleviated somewhat by pain medication.  (Id.)  X-rays of his right foot, ankle, and leg were normal.  (Id. at 261-62.)  Computed tomography (CT) scans of his abdomen, pelvis, chest, head, thoracic spine, and lumbar spine were also normal.  (Id. at 262-63, 264-65.)  A CT scan of his cervical spine revealed anterior fusion at C5-C6 and a degenerative change at C6-C7, but no acute abnormality.  (Id. at 263-64.)  He was discharged within four hours.  (Id. at 254, 256.)

Plaintiff returned to St. John's emergency room five days later with loss of sensation to his right lower leg and of pain in that leg and ankle.  (Id. at 266-74.)  He was examined and discharged within the hour.  (Id. at 269-70.)

Plaintiff's prescription for hydrocodone-acetaminophen was renewed when he saw Dr. Fan again on June 18.  (Id. at 327-29.)

The following month, on July 20, Plaintiff was seen by Abdul N. Naushad, M.D., at Advanced Pain Center.[12]  (Id. at 324-26.)  There were no side effects from his medication; however, his pain was a six.  (Id. at 326.)  He was to be scheduled for a thoracic epidural injection.  (Id.)  Dr. Naushad noted on August 17 that a urine drug screen of Plaintiff had

---

[12]See note 11, supra.

been positive for Lorcet,[13] which he described as helping to manage Plaintiff's pain, and morphine, which Plaintiff denied using. (Id. at 321.)

Plaintiff saw Dr. Rickmeyer again in August. (Id. at 278-82.) In addition to a urinary retention problem, Plaintiff complained of anxiety as a result of the motorcycle accident. (Id. at 278.) Specifically, he was fearful, compulsive, irritable, indecisive, fatigued, and had diminished interest or pleasure. (Id.) On examination, he was oriented to time, place, person, and situation and had a normal affect. (Id. at 279.) Dr. Rickmeyer described him as follows.

> [Plaintiff] is negative for anhedonia,[14] is anxious, does not exhibit compulsive behavior, has normal knowledge, has normal language, is not in denial, is not euphoric, is not tearful, has flight of ideas, is not forgetful, does not have thoughts of grandiosity, denies hallucinations, denies hopelessness, has increased activity, is not having memory loss, has no mood swings, has obsessive thoughts, does not have paranoia, has normal insight, exhibits normal judgment, has normal attention span and concentration, has pressured speech, does not have suicidal ideation, and does not have homicidal ideation.

(Id.) (Footnote added.) He diagnosed Plaintiff with PTSD, prescribed Zoloft for his panic disorder, and advised him to see a counselor. (Id. at 279-80.) A subsequent x-ray of his left knee was normal; x-rays of his right hand and wrist revealed severe osteoarthritis of his right thumb base. (Id. at 281-82.)

---

[13]Lorcet is a combination of hydrocodone and acetaminophen. See Drugs.com, Lorcet, http://www.medilexicon.com/drugsearch.php?s=lorcet (last visited July 18, 2012).

[14]Anhedonia is the "[a]bsence of pleasure from the performance of acts that would ordinarily be pleasurable." Stedman's Medical Dictionary, 90 (26th ed. 1995).

Dr. Naushad noted at Plaintiff's September 25 visit that the low level of morphine shown in the drug screen was probably an impurity.  (Id. at 318.)  Plaintiff's medications were renewed.  (Id. at 317.)

Plaintiff's prescription for hydrocodone-acetaminophen was refilled when he saw Dr. Fan on October 23.  (Id. at 314-16.)  His pain was a six to seven.  (Id. at 315.)  He had a full range of motion without pain in his thoracic and lumbar spine.  (Id. at 314.)  His muscle tone, strength, and stability were normal.  (Id.)  As before, Plaintiff was described as being alert, awake, and oriented to time, place, people, and location.[15]  (Id.)  His speech, thought process, associations, and judgment were normal.  (Id.)  He had no psychotic thoughts.  (Id.)  Five days later, Dr. Naushad gave Plaintiff a thoracic epidural steroid injection.  (Id. at 312-13.)  A second injection was given on November 9.  (Id. at 309-10.)  Plaintiff reported to Dr. Fan on November 20 that the injection had helped; his pain was a five.  (Id. at 306-07.)  A third injection was given on November 30.  (Id. at 304-05.)

Between visits to Drs. Fan and Naushad, Plaintiff saw Dr. Rickmeyer, on October 27, and reported that the Zoloft was causing sexual side effects and requested a change to Celexa.  (Id. at 276-77.)  He was emotionally stable and was not having any panic attacks.  (Id. at 276.)  He was having constant chest pain.  (Id.)  This pain had begun two weeks earlier and was not accompanied by any shortness of breath or light headedness.  (Id.)  He was prescribed ranitidine for the chest pain and Celexa for the anxiety.  (Id. at 277.)  He was to contact Dr. Rickmeyer in one month and let him know how he was doing.  (Id.)

_____

[15]See note 11, supra.

After the second injection by Dr. Naushad, Plaintiff consulted Jay Liss, M.D.  (Id. at 294.)  The notes of this visit consist of a reference to Plaintiff seeing a psychiatrist after a friend was killed, being an aviation mechanic, and "Soc. Sec."  (Id.)  His medications included hydrocodone for a back injury and Cymbalta.[16]  (Id.)  Dr. Liss' diagnosis was PTSD.  (Id.)  He assessed Plaintiff as having a GAF of 60.[17]  (Id.)

Dr. Liss saw Plaintiff again on December 16.  (Id. at 293.)  In his ten-word notation, Dr. Liss refers to Plaintiff's "ocd personality" and "the accident."  (Id.)  Cymbalta was listed as the only medication.  (Id.)  PTSD was the only diagnosis.  (Id.)  There was no GAF listed. (Id.)

Two days later, reporting that the Lorcet was not helping, that the thoracic epidural steroid injection had helped "some," and that the nerve block had helped, Plaintiff saw Dr. Fan again.  (Id. at 300-02.)  On examination, his thoracic spine was normal and a full range of motion without pain.  (Id. at 300.)  There was midline bilateral diffuse tenderness.  (Id.)  His neuromuscular examination was normal.  (Id.)  Also normal were his orientation, association, judgment, speech, thought processes, attitude, and pain behavior.  (Id.)  He was given a prescription for Embeda;[18] his dosage of Lorcet was reduced.  (Id. at 301.)  Plaintiff

---

[16]Cymbalta is an anti-depressant.  See PDR at 1759.

[17]See note 4, supra.

[18]Embeda is a morphine sulfate prescribed for "the management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is need for an extended period of time."  PDR at 1716.

reported to Dr. Fan on December 31 that the Embeda was not helping.[19] (Id. at 297-99.) His condition was described as before. (Id. at 297.) He was placed on Lorcet again and was also prescribed Mobic, a nonsteroidal anti-inflammatory prescribed for the treatment of pain caused by osteoarthritis and rheumatoid arthritis,[20] due to his pain being worse in the winter. (Id. at 298.) His pain was a five. (Id.) On being informed that Mobic was not covered under Medicaid, Dr. Fan changed the prescription to Naproxen. (Id. at 296.)

The records of Plaintiff's January 2010 visit to Dr. Fan read the same as his December visit, including a reference to being restarted on Lorcet and his pain being a five. (Id. at 437-39.)

On February 8, Dr. Naushad administered a nerve block injection to Plaintiff's thoracic spine. (Id. at 441-43.)

The following week, Plaintiff saw Dr. Liss. (Id. at 378.) As before, Dr. Liss' notes are brief. (Id.) He refers to reviewing PTSD and grief and recovery. (Id.) Plaintiff's only medication was Cymbalta. (Id.) There is a notation that it was discontinued, but no explanation of who by or when. (Id.) The only diagnosis is PTSD. (Id.)

Shortly thereafter, on February 25, Plaintiff returned to Dr. Fan, reporting that the functional impairment caused by his thoracic back pain was mild and did not interfere with

---

[19]Dr. Fan also noted that Plaintiff was using a transcutaneous electrical nerve stimulation (TENS) unit as needed and that it "helped a little." (Id. at 299.) There is no other record of him using a TENS unit, including of a physician recommending its use.

[20]See Drugs.com, Mobic, http://www.drugs.com/search.php?searchterm=Morbic (last visited July 12, 2012).

his daily activities.  (Id. at 444-45.)  His neck pain was worse.  (Id. at 445.)  He was continued on the same medications.  (Id.)

Plaintiff consulted Daniel R. Wagner, M.D., on March 16 about his obstructive sleep apnea.  (Id. at 417-19.)  Dr. Wagner noted that Plaintiff's CPAP machine titration had been retitrated in April 2009 from five centimeters to seven.  (Id. at 418.)  He also noted that the amount of time Plaintiff spent sleeping had increased to ten hours a night yet he could still fall back asleep during the day.  (Id. at 418-19.)  Plaintiff had been laid-off from his job as a small plane maintenance mechanic and was unsure if he could return to work because he felt he had lost the "'sharpness'" for which he had prided himself.  (Id. at 419.)  Three days later, Plaintiff's wife telephoned and reported that Plaintiff had difficulty waking up in the morning.  (Id. at 420.)  They wanted a brain scan, citing a remark by Dr. Wagner that Plaintiff might have a blockage in his brain.  (Id.)

Subsequently, Plaintiff underwent a sleep study at St. Anthony's Sleep Disorder Center to check the effectiveness of the titration on his CPAP machine.  (Id. at 385-414.)  His urine drug screen was positive for opiates and benzodiazepines.  (Id. at 389.)  It was noted that he had been using a CPAP machine since being diagnosed with obstructive sleep apnea in December 2008.  (Id. at 392.)  The recommendation was that Plaintiff be continued on the same titration level as before.  (Id. at 394.)  Dr. Wagner followed that recommendation.  (Id. at 421-23.)  He noted that Plaintiff's napping during the day had begun five years earlier and his increased sleeping two years earlier.  (Id. at 423.)  Beginning two and one-half weeks earlier and lasting for two weeks, Plaintiff had slept for most of the days and nights.  (Id.)

For the past three to four days, Plaintiff had returned to sleeping ten hours at night and to napping during the day. (Id.) Dr. Wagner noted that Plaintiff's dosage of PRISTIQ[21] had been doubled three weeks earlier. (Id.) He also reviewed with Plaintiff the symptoms of atypical depression, including an increased amount of sleep. (Id.)

Plaintiff saw Dr. Naushad on March 29, was given another injection on April 12, and reported on April 26 that his activities of daily living, including his family and social relationships, his mood, and his sleep patterns, were all better. (Id. at 446-52.) The Lorcet and injections were to be continued. (Id. at 452.)

When Dr. Liss next saw Plaintiff, on April 29, PTSD remained the only diagnosis. (Id. at 379.) A GAF was included on this note – it was 51. (Id.) Reference is again made to recovering, grief, and PTSD. (Id.) Dr. Liss noted that Plaintiff was doing a little better. (Id.) He also noted that Plaintiff's social security application had been denied two months earlier and that an attorney was handling his personal injury suit. (Id.) PRISTIQ was listed as a medication Plaintiff was taking, as was hydrocodone. (Id.)

Plaintiff reported to Dr. Wagner on May 13 that the increased dosage of PRISTIQ was having little effect on his depression. (Id. at 424-26.) He also reported that he was doing a little better, particularly in the morning. (Id. at 424.) Again, Dr. Wagner discussed with Plaintiff the increased sleepiness associated with atypical depression. (Id. at 426.) He informed Plaintiff that discontinuing the CPAP machine, as Plaintiff had, for ten days was

---

[21]PRISTIQ is prescribed for the treatment of major depressive disorder. PDR at 3409.

not long enough a test to see if it made any difference.  (Id.)  Plaintiff did not appear for his next June appointment and canceled the rescheduled one.  (Id. at 427-29.)

Plaintiff did keep an appointment on May 15 for another injection by Dr. Naushad and was described two weeks later as stable on his medications.  (Id. at 453-56.)

On July 1, Plaintiff reported to Dr. Wagner that he was doing "60% better" on the increased dosage of PRISTIQ and on Provigil.  (Id. at 430-31.)  He was getting up at 6:30 a.m. and not between 10:00 a.m. and noon as he had been doing.  (Id. at 430.)  His mood was better; his anhedonia was less.  (Id. at 431.)  He was to follow up with Dr. Wagner in three months.  (Id. at 430.)

The next day, Plaintiff saw Dr. Naushad and described his pain as a four to five.  (Id. at 457-58.)  He was continued on his current medication, Lorcet.  (Id. at 458.)

Plaintiff saw Dr. Liss on August 6.  (Id. at 435.)  Dr. Liss noted that Plaintiff had been denied social security, was to have a hearing, and had taken Zoloft.  (Id.)  He also noted that Plaintiff was not taking PRISTIQ.  (Id.)  There are no other notations.  (Id.)  No diagnosis is listed.  (Id.)

Plaintiff was given another injection by Dr. Naushad on August 14.  (Id. at 459-61.)

Plaintiff telephoned Dr. Wagner on September 23 to report that the Provigil was causing a backache.  (Id. at 432.)  They were to discuss Plaintiff discontinuing the Provigil when he saw Dr. Wagner in two weeks.  (Id.)

Plaintiff returned to Dr. Liss on October 1.  (Id. at 436, 476.)  Other than a reference to the status of his DIB claim, the notes refer to Plaintiff being "[p]erplexed by his dreams"

and not being able "to tell reality." (Id.) Another note reads "Victim/bystander." (Id.) A diagnosis of PTSD is listed. (Id.) Dr. Liss' notes dated seven days later read "we ran out of time." (Id. at 475.) He also noted that Plaintiff reported having "had violent feelings." (Id.) As before, no medications are listed; a diagnosis of PTSD is; a GAF is not. (Id. at 475.) The following month, on November 12, Dr. Liss did list a GAF of 40.[22] (Id. at 474.) He also listed Plaintiff's children, the status of his social security claim, a reference to Plaintiff being sued, and a note that Plaintiff was not working. (Id.)

Between these two visits to Dr. Liss, Plaintiff saw Dr. Naushad, reporting that his medications were working and he had no new complaints. (Id. at 464.) His cervical, thoracic, lumbar, and sacral spines had a normal range of motion. (Id.) He had normal muscle strength and tone and stability in his lumbar spine. (Id.) He had moderate, diffuse bilateral tenderness in his thoracic spine. (Id.) His neuromuscular examination was, as before, normal. (Id.)

Also before the ALJ were various assessments of the limitations caused by Plaintiff's impairments.

In January 2010,[23] Dr. Liss completed a five-page Mental Residual Functional Capacity Questionnaire (MRFCQ) on behalf of Plaintiff. (Id. at 288-92.) In addition to a diagnosis of PTSD, Dr. Liss listed obsessive compulsive disorder. (Id. at 289.) Plaintiff's current GAF was less than 50; his highest during the past year was 85. (Id.) He described

---

[22]See note 3, supra.

[23]A year of "2009" is listed; this is clearly an error.

his clinical findings as constant flashbacks, guilt, panic, anxiety, depression, and "startle." (Id.) The prognosis was "poor"; there was little treatment for PTSD other than Cymbalta. (Id.) Asked to identify which of fifty-six listed signs and symptoms Plaintiff had, Dr. Liss checked twenty-one: anhedonia; appetite disturbance with weight change; decreased energy; thoughts of suicide; feelings of guilt or worthlessness; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; psychomotor agitation or retardation; persistent disturbance of mood or affect; change in personality; apprehensive expectation; paranoid thinking or inappropriate suspiciousness; recurrent obsessions or compulsions which are a source of marked distress; emotional withdrawal or isolation; perceptual or thinking disturbances; memory impairment; sleep disturbance; recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; psychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor; and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week. (Id. at 288.) Plaintiff was unable to meet competitive standards in all sixteen of the listed abilities and aptitudes needed to do unskilled work. (Id. at 290.) Asked to explain his conclusions, Dr. Liss noted that PTSD causes severe distraction, spacing out, and work danger. (Id.) Plaintiff was unable to meet competitive standards in all four of the listed abilities and aptitudes needed to do semiskilled and skilled work: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) set realistic goals or make plans independently of others; and (4) deal with the stress of semiskilled and skilled

work.  (Id. at 291.)  Of the mental abilities and aptitudes needed to do particular types of jobs, Plaintiff was unable to meet competitive standards in three and was limited but satisfactory in two.  (Id.)  The former included interacting appropriately with the general public; maintaining socially appropriate behavior; and traveling in unfamiliar places.  (Id.)  The latter included adhering to basic standards of neatness and cleanliness and using public transportation.  (Id.)  Asked to explain, Dr. Liss noted that PTSD causes distraction and confusion.  (Id.)  Dr. Liss opined that Plaintiff's impairments would cause him to be absent from work more than four days a month and were expected to last at least twelve months.  (Id. at 292.)  As an additional reason why Plaintiff would have difficulty working at a regular job, Dr. Liss noted that the accident caused permanent brain damage to his wife.  (Id.)  Plaintiff could manage his benefits in his own interests.  (Id.)

The following month, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Deanna Babcock, an agency nonmedical, nonexaming consultant.  (Id. at 67-72.)  The primary diagnosis was thoracic and cervical spondylosis; the secondary diagnosis was sleep apnea.  (Id. at 67.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and stand, sit, or walk about six hours in an eight-hour day.  (Id. at 68.)  He had postural limitations of only occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs.  (Id. at 69.)  He should never climb ladders, ropes, or scaffolds.  (Id.)  His ability to reach in all directions was limited, but his abilities to handle, finger, and feel were unlimited.  (Id.)  He had no visual or communicative limitations.  (Id.

at 69-70.)  He should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and similar conditions.  (<u>Id.</u> at 70.)

That same month, Robert Cottone, Ph.D., completed a Psychiatric Review Technique form (PRTF) for Plaintiff.  (<u>Id.</u> at 362–73.)  Plaintiff was described as having an anxiety-related disorder, i.e., recurrent obsessions or compulsions and recurrent and intrusive recollections of a traumatic experience, with such recurrences being a source of marked distress.  (<u>Id.</u> at 362, 366.)  This disorder was severe, but not expected to last twelve months. (<u>Id.</u> at 362.)  The disorder resulted in mild difficulties in maintaining social functioning, mild restrictions of activities of daily living, and mild difficulties in maintaining concentration, persistence, or pace.  (<u>Id.</u> at 370.)  The disorder did not result in any episodes of decompensation of extended duration.  (<u>Id.</u>)

Dr. Liss completed another MRFCQ in August.  (<u>Id.</u> at 380-84.)  His diagnosis remained PTSD; no medications were being prescribed.  (<u>Id.</u> at 380.)  Plaintiff's prognosis remained "poor." (<u>Id.</u>)  His remaining answers, including the degree of limitation caused by the PTSD on Plaintiff's various work-related abilities, were as before.  (<u>Id.</u> at 381-84.)

In November, Plaintiff was evaluated by Joseph M. Long, Ph.D., pursuant to his DIB application.  (<u>Id.</u> at 468-73.)  Dr. Long, a clinical psychologist, did not do any "formal psychological testing" of Plaintiff.  (<u>Id.</u> at 468.)  He described Plaintiff's appearance, demeanor, and responses as follows.

> [Plaintiff] was dressed in clean, casual attire and displayed good attention to hygiene and grooming.  His goatee was neatly trimmed and his head shaved close.  He walked with a normal gait and required no assistance getting to the office.  He was alert and oriented.  He was able to correctly identify the date

but noted that this was because he looked at the appointment letter for the exam. He was able to correctly identify the current and former presidents of the US. He was able to recall three of three items he was asked to remember in a test of short term memory. He commented that "if someone highlights it, I'll try to stay focused." He correctly completed both the Serial 4 addition and Serial 7 subtraction tasks. Asked how he would deal with a letter found lying on the ground, he promptly indicated that he would drop it in a mailbox. Asked how he would deal with a fire in a crowded theater, he replied "get out." There was no evidence of gross impairment of psychological functioning due to hallucinations, delusional ideation, or extreme emotional lability. During the exam, [Plaintiff's] affect was pleasant in a matter of fact way until he entered a lengthy and detailed description of the 2009 motorcycle wreck in which his wife suffered TBI [traumatic brain injury]. . . . [Plaintiff's] thought process was logical and coherent, although he clearly perseverated on the details of the motorcycle accident and its impact on the families [sic] lives. He did respond to the examiner's prompts to move on with the interview narrative. He was cooperative and responsive to the examiner's inquiries. Intellect is estimated to be in the average to perhaps above average range.

(Id. at 468-69.) Plaintiff reported that he and his wife had a four-year old son after years of trying to conceive. (Id. at 469.) He also had two older children by two different women. (Id.) He reported that, after the accident, his wife was not permitted to cook because of the risk of starting a fire. (Id. at 470.) He manages her medication regimen. (Id.) He stays busy taking care of his children and wife. (Id.) He had tried various antidepressants, but stopped because he did not like being dependent on medication. (Id.) He saw a psychiatrist once a month. (Id.) Dr. Long's diagnosis was PTSD, generalized anxiety disorder, and obsessive compulsive personality style, by history. (Id.)

Completing a Medical Source Statement of Ability to Do Work-Related Activities (Mental), Dr. Long assessed Plaintiff as having no limitations in three of the six abilities listed under the category of understanding, remembering, and carrying out instructions. (Id. at 471.) These three are (1) understand and remember simple instructions; (2) carry out

simple instructions; and (3) make judgments on simple work-related decisions. (Id.) Plaintiff had a moderate limitation in the remaining three abilities: (4) understand and remember complex instructions; (5) carry out complex instructions; and (3) make judgments on complex work-related decisions. (Id.) Dr. Long noted that Plaintiff experienced PTSD when not focused on a specific task. (Id.) Assessing Plaintiff's limitations when interacting with others, Dr. Long concluded that he was moderately limited in all four listed abilities: interacting appropriately with the public, with supervisors, with coworkers, and responding appropriately to usual work situations and to changes in a routine work setting. (Id. at 472.)

## The ALJ's Decision

The ALJ first noted that Plaintiff had sufficient earnings to remain insured only through December 31, 2013. (Id. at 12, 14.) Plaintiff had not engaged in substantial gainful activity since his alleged onset date of May 30, 2009. (Id. at 14.) The ALJ next found that Plaintiff had severe impairments of anxiety reaction, PTSD, and residuals of cervical fusion. (Id.) The latter finding was based on a 1995 cervical fusion and Plaintiff's complaints of neck pain. (Id.) These impairments did not, singly or in combination, meet or medically equal an impairment of listing-level severity. (Id. at 15.) Specifically, Plaintiff's mental impairments did not satisfy the "B" criteria for Listing 12.04 because Plaintiff did not have marked restrictions in at least two of the three areas of functioning or marked restrictions in one area and repeated episodes of decompensation, each of extended duration. (Id.) Instead, Plaintiff had mild restrictions in his activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, and pace; and no episodes

of decompensation.  (Id.)  There was also no evidence of the presence of any "C" criteria. (Id.)

Plaintiff had, the ALJ concluded, the residual functional capacity (RFC) to perform light work.  (Id.)  And, he could understand, remember, and carry out at least simple instructions and non-detailed tasks and could respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others was casual and infrequent.  (Id. at 15-16.)  Conversely, he should not work in a setting with constant or regular contact with the general public or a setting requiring more than infrequent handling of customer complaints.  (Id. at 16.)

When assessing Plaintiff's RFC, the ALJ reviewed the medical records and evaluated the credibility of Plaintiff's statements about the intensity, persistence, and limiting effects of his described symptoms.  (Id. at 16-18.)  The ALJ noted that the objective medical records did not support Plaintiff's claims of disabling pain.  (Id. at 17.)  Plaintiff had told Dr. Rickmeyer that he was emotionally stable on Zoloft and told Dr. Liss in April 2010 that he was doing a little better.  (Id.)  Dr. Liss' GAF of 51 indicated moderate symptoms or moderate difficulties.  (Id.)  The ALJ also noted that Plaintiff's wife is disabled as a result of the May 2009 accident and that Plaintiff has a lawsuit pending as a result of the accident. (Id. at 18.)  The ALJ questioned whether Plaintiff was motivated by secondary gain.  (Id.) Plaintiff told Dr. Long that he spent his days taking care of his wife and four-year old son. (Id.)

The ALJ did not give significant weight to Dr. Liss' assessment, finding it not to be supported by his brief three-to-four sentence statements. (Id.) The ALJ also found that Dr. Liss' conclusion that Plaintiff could not understand, remember, and carry out very short, simple instructions to be inconsistent with Plaintiff being able to use public transportation and manage his DIB benefits. (Id.) The ALJ did give significant weight to the conclusions of Dr. Long, finding them to be consistent with the medical records. (Id.) The ALJ also noted that Dr. Reid had found Dr. Long's RFC assessment to be appropriate. (Id.)

With his RFC, Plaintiff could not, however, perform his past relevant work. (Id.) He could perform jobs identified by the VE that exist in significant numbers in the state and national economies. (Id. at 19.) He was not, therefore, disabled within the meaning of the Act. (Id. at 20.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520 (2010); **Hurd**, 621 F.3d at 738; **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 404.1520(b) (2010); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. § 404.1520(c) (2010).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. § 404.1520(d) (2010) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."

**Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ must first evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). Additionally, "[a]n ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform

the functional requirements of the job as [ ]he actually performed it or as generally required by employers in the national economy." **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f) (2010).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the

Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones v. Astrue**, 619 F.3d 963, 968 (8th Cir. 2010); **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision." **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789). <u>See</u> <u>also</u> **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred by (1) not basing his RFC findings on all the medical evidence and (2) not including all his restrictions and limitations in the hypothetical question posed to the VE.

After reviewing the record, including Plaintiff's medical records, and assessing his credibility, the ALJ determined that he had the RFC to perform light work requiring that he understand, remember, and carry out at least simple instructions and non-detailed tasks and respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others was casual and infrequent. Plaintiff did not have the RFC to work in a setting

with constant or regular contact with the general public or in a setting requiring more than infrequent handling of customer complaints.

"The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitation." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (July 2, 1996)); accord **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003). "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others." **Roberson**, 481 F.3d at 1023. See also SSR 96-8p, 1996 WL 374184 at *5 (listing factors to be considered when assessing a claimant's RFC, including, among other things, medical history, medical signs and laboratory findings, effects of treatment, medical source statements, recorded observations, and "effects of symptoms . . . that are reasonably attributed to a medically determinable impairment").

An ALJ does not, however, fail in his duty to assess a claimant's RFC on a function-by-function basis merely because the ALJ does not address all areas regardless of whether a limitation is found. See **Depover**, 349 F.3d at 567. Instead, an ALJ who specifically addresses the areas in which he found a limitation and is silent as to those areas in which no limitation is found is believed to have implicitly found no limitation in the latter. **Id.** at 567-68. See also **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ does not fail in duty to fully develop the record by not providing "an in-depth analysis of each piece of

record"); **Craig v. Apfel**, 212 F.3d 433, 436 (8th Cir. 2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.") (finding it "highly unlikely that the ALJ did not consider and reject" portions of report given the ALJ's explicit reliance on other portions of report).

Plaintiff contends that the assessments by his treating physician, Dr. Liss, required a more restrictive RFC than that found by the ALJ, who impermissibly relied on the opinions of Drs. Long and Reid, the former having examined Plaintiff once and the latter not at all. Indeed, if the ALJ had accepted Dr. Liss' assessments of Plaintiff's RFC a finding of disability would have to follow. As explained below, however, the ALJ did not err by not doing so.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" **Id.** (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir.2000)). See also 20 C.F.R. § 404.1527(d) (2010) (listing six factors to be evaluated when weighing opinions of treating physicians, including

supportability and consistency). And, "[i]t is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes," **Davidson**, 578 F.3d at 843, or when it consists of conclusory statements, **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010). See also **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements.").

In the instant case, although Plaintiff was routinely described by other treating physicians as having normal affect, orientation, speech, attitude, insight, judgment, and concentration, and as being well-groomed, responsive, and cooperative, Dr. Liss' brief notes lack any description of Plaintiff's appearance, mood, or psychiatric symptoms.[24] Indeed, three months after the accident giving rise to Plaintiff's allegations of PTSD, he was described by Dr. Rickmeyer as, among other things, not being anxious, tearful, paranoid, forgetful, compulsive, or anhedonic. Rather, Plaintiff had a normal attention span and concentration, no mood swings, and increased activity. Similarly, five months after the accident, Plaintiff was described by (a) Dr. Fan as being alert and with normal thought processes, speech, and judgment and (b) Dr. Rickmeyer as being emotionally stable. In contrast, the notes of Dr.

---

[24]The Court notes an exception when Dr. Liss reported in October 2010 that Plaintiff couldn't "tell reality" and later that same month that Plaintiff reported he had "had violent feelings." (R. at 475, 476.) These exceptions are not Dr. Liss' observations, however, but are reports of what Plaintiff told him. Plaintiff does not challenge the ALJ's adverse credibility determination.

Liss' first visit with Plaintiff – six months after the accident – include no descriptions of Plaintiff's mental state. Additionally, although Dr. Liss opines that Cymbalta is the only treatment for PTSD, his notes refer to it being discontinued. Dr. Liss' notes routinely include only a diagnosis and, sometimes, a GAF finding that is inconsistent with the breath and depth of the limitations Dr. Liss describes in his assessments. Also, the first assessment, concluding, inter alia, that Plaintiff would be unable to meet competitive standards in all abilities and aptitudes required for unskilled work, was completed after Dr. Liss had seen Plaintiff twice. The record of the first visit includes a diagnosis of PTSD in the context of a friend being killed and to a GAF of 60, indicative of, at worst, moderate symptoms.[25] The record of the second visit refers to an "ocd personality," but has only a diagnosis of PTSD.

Also detracting from the weight to be given Dr. Liss' assessments is the form of his two assessments – a series of check marks to rate the severity of the affect of Plaintiff's PTSD on his various mental abilities and aptitudes. Whenever asked to explain to his rating, Dr. Liss simply notes the general affect of PTSD, e.g., "PTSD causes distraction." (See R. at 382.) A checklist format and conclusory opinions, even of a treating physician, are of limited evidentiary value. **Wildman**, 596 F.3d at 964; **Wiese**, 552 F.3d at 732. In **Wildman**, the Eighth Circuit held that the ALJ had properly discounted a treating physician's assessment as conclusory when that "opinion consist[ed] of three checklist forms, cite[d] no medical

---

[25]A GAF score of 60 is but one below the range of 61 and 70, indicative of "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

evidence, and provide[d] little to no elaboration."  596 F.3d at 964.  And, in **Teague v. Astrue**, 638 F.3d 611, 615 (8th Cir. 2011), as in the instant case, the treating physician's "'check-off form'" medical source statement was "procured and submitted by counsel after the initial denial of benefits" and provided the only direct evidence of functional limitations tied to the claimant's cited impairment.  **Id.** at 615.  The statement did not cite any clinical tests results or findings and was inconsistent with the physician's previous treatment notes.  **Id.** The court held that the ALJ had not erred by not giving it any weight.  **Id.**

Plaintiff further argues that the agreement of Drs. Long and Liss that Plaintiff satisfies the first prong of Listing 12.06(A)(5) gives weight to Dr. Liss' assessments.  At all times relevant, this prong required medically documented findings of "[r]ecurrent and intrusive recollections of a traumatic experience, which are a source of marked distress[.]"  20 C.F.R. Pt. 404, Subpt. P. App.1, § 12.06(A)(5) (2010).  Aside from the debatable question of whether Plaintiff's attacks would satisfy the twelve-month durational requirement, his panic attacks must also satisfy the "B" criteria of Listing 12.06 to be considered disabling.  See 20 C.F.R. Pt. 404, Subpt. P. App. 1 § 112.00(A) (2010) (requiring that claimant's mental impairment satisfy both the medical findings listed in paragraph "A" and the functional restrictions described in paragraph "B," which must be the result of the mental disorder manifested by the "A" findings).  This criteria requires that Plaintiff's anxiety disorder have at least two marked restrictions in three functional areas or one marked restriction and repeated episodes of decompensation, each of extended duration.  20 C.F.R. Pt. 404, Subpt. P. App.1, § 12.06(B) (2010).  The burden of establishing this is on Plaintiff.  See **Johnson v. Barnhart**, 390 F.3d

1067, 1070 (8th Cir. 2004). To carry this burden, Plaintiff relies on Dr. Liss' assessments, which are unavailing as set forth above.

Plaintiff argues that without Dr. Liss' assessments, there was only the insubstantial evidence of a consultative examiner and a non-examining medical expert. Plaintiff mischaracterizes the evidence. Although it is not favorable to his position, it is not insubstantial. Indeed, it was sufficient for the ALJ to determine Plaintiff's RFC. <u>See</u> **<u>Martise</u>**, 641 F.3d at 926-27 (ALJ fails in duty to develop medical record only if the medical records before him to do not provide sufficient evidence for him to determine whether claimant is disabled).

Citing his diagnosis of thoracic spondylosis and the various injections, medications, and blocks employed to treat resulting pain, Plaintiff contends that there is also no evidence to support the ALJ's conclusion that he can perform light work. In April 2009, Plaintiff complained of thoracic pain of five years' duration. He had substantial earnings during those five years, including annual earnings of $54,247[26] in 2007 and $49,102 in 2009. (<u>See</u> R. at 180.) His earnings stopped in May 2009 – one month after his initial complaint of pain to Dr. Fan. Indeed, his alleged disability onset date is one week after he described the pain as a seven on a ten-point scale. The month after filing his DIB application, Plaintiff described the pain as mild and reported it did not interfere with his daily activities. Additionally, neither Dr. Fan nor Dr. Naushad ever placed any functional limitations on Plaintiff due to his thoracic spondylosis.

---

[26]The numbers are rounded to the nearest dollar.

Plaintiff next takes issue with the omission from the hypothetical question to the VE of limitations described by Dr. Long in his report. Again, Plaintiff mischaracterizes the record. He states that he had to be reminded repeatedly to focus his attention in order to complete simple tasks given to him by Dr. Long. (Pl.'s Br. at 18, ECF No.15.) This phrasing is from his attorney's question to Dr. Reid during the hearing. (See R. at 65.) What Dr. Long reported was that Plaintiff "performed well on the relatively simple MSE [mental status examination] tasks but clearly hyperfocuses/experiences PTSD sx [symptoms] when not focused on a specific task." (Id. at 471.) "'The ALJ's hypothetical question to the [VE] needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.'" **Renstrom**, 680 F.3d at 1067 (quoting Martise, 641 F.3d at 927). The question need not incorporate additional limitations properly disregarded by the ALJ. **Id.** Such limitations may include those based on a discounted claimant's subjective complaints[27] and those based on medical opinions that the ALJ has given less weight to than to others. **Id.** Accord **Perkins v. Astrue**, 648 F.3d 892, 902 (8th Cir. 2011); **Heino v. Astrue**, 578 F.3d 873, 882 (8th Cir. 2009). In the instant case, the ALJ posed a hypothetical question to the VE that encompassed the concrete consequences of the impairments he found to be supported by substantial evidence on the record as a whole. The question was, therefore, proper.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision.

---

[27]Plaintiff does not challenge the ALJ's credibility determination.

"If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently."  **Wildman**, 596 F.3d at 964. Accordingly,

      **IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

      The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  2nd  day of August, 2012.